# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **PAMELA M. DACE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 4:17-CV-01775-PLC** |
| | ) | |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Pamela Dace seeks review of Defendant Commissioner of Social Security Andrew Saul denying her applications for Disability Insurance Benefits, and Supplemental Security Income under the Social Security Act ("Act"). Based on the following, the Court will reverse and remand the Commissioner's decision.

### I.      Procedural Background

Plaintiff, who was born on October 19, 1976, filed protective applications for a period of disability, Disability Insurance Benefits, and Supplemental Security Income in December 2007 alleging that she was disabled as of November 9, 2004 due to a back injury, bipolar disorder, short-term memory problems, ADHD, migraines, and anxiety disorder.[1]  (Tr. 129-31, 132-36). The Social Security Administration (SSA) denied Plaintiff's applications, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (Tr.  61-62, 93-94)

ALJ Michael Mance held a hearing in October 2009 and issued a decision denying plaintiff's applications in March 2010.  (Tr. 10-54, 68-79)  Plaintiff filed a request for review

---

[1] The record reveals that Plaintiff previously applied for Social Security benefits in June 1995, April 2001, November 2004.  (Tr.200-01)

with the SSA Appeals Council, which denied review in March 2010. (Tr. 7, 87)  Plaintiff appealed ALJ Mance's adverse ruling to the United District Court for the Eastern District of Missouri.  See Dace v. Colvin, No. 4:12-CV-47 TIA, 2014 WL 1228894, at *22 (E.D. Mo. Mar. 25, 2014).

In March 2014, Judge Terry Adelman issued an order reversing ALJ's Mance's 2010 decision.  Dace, 2014 WL 1228894, at 23.  The court held that substantial evidence did not support the finding that Plaintiff was able to perform work at the medium exertional level because there was "no opinion in the record from any physician regarding Claimant's work-related limitations…[and] no opinion from any physician regarding how Claimant's impairments affect her ability to work."  Dace v. Colvin, No. 4:12-CV-47 TIA, 2014 WL 1228894, at *22 (E.D. Mo. Mar. 25, 2014).  The court reversed and remanded the case to the Commissioner for further development of the record, including a consulting physician's "clarification and/or explanation of Claimant's limitations and their relationship to her ability to perform work-related activities and to function in the workplace."  Id. at 23.

In January 2012, while Plaintiff's appeal was pending in the Eastern District, she filed a new application for Supplemental Security Income, claiming that she became disabled on March 16, 2010 as a result of:  "major depression, anxiety disorder, panic disorder etc.; agoraphobia; PTSD; mental illness, IBS; degenerative disc disease." (Tr. 1458-63, 1593)  The SSA denied this application and granted her subsequent request for a hearing before an ALJ. (Tr. 1399-1406)

ALJ Debra Denney conducted a hearing in July 2013.  (Tr.1099-1195)  In a decision dated September 20, 2013, she denied Plaintiff's application.  (Tr. 1203-17)  Plaintiff filed a request for review of the ALJ's decision by the SSA Appeals Council, which denied the request. (Tr. 1056)

After the court reversed and remanded ALJ's Mance's 2010 decision, the Appeals Council vacated that decision and remanded the case to an ALJ "for further proceedings consistent with the order of the court." (Tr. 1273-74) In the remand order, the Appeals Council administratively combined Plaintiff's January 2012 application for SSI benefits, which ALJ Denney denied in the September 2013 decision. (Id.) The Appeals Council directed the ALJ to "consider that decision if necessary, consistent with applicable reopening regulations, when deciding the claim remanded by the court. (Tr. 1273)

ALJ Bradley Harlan (hereinafter, "the ALJ") reopened ALJ's Denney's September 2013 decision and considered whether Plaintiff was disabled at any time after November 9, 2004. (Tr. 1058) The ALJ conducted a hearing in 2015. (Tr. 1156-95) After the hearing, the ALJ obtained medical source statements from consulting physician Dr. Anne Winkler and consulting psychologist Dr. Karyn Perry.[2] (Tr. 1057, 2106-15, 2132-41) However, the ALJ decided not to order an consultative examination, reasoning: "the claimant's ample treatment notes and the interrogatories completed by two impartial medical experts provide a sufficient basis for making a decision on her claims." (Tr. 1058)

In a decision dated January 20, 2016, the ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform a limited range of medium work. (Tr. 1070) He therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 9, 2004, through the date of this decision[.]" (Tr. 1087)

Plaintiff requested review of the ALJ's decision in February 2016. (Tr. 1394-95) On September 27, 2016, Plaintiff's counsel forwarded to the Appeals Council a copy of a

---

[2] Another psychological expert, Dr. James Reid declined to review Plaintiff's medical records and complete the requested interrogatories. (Tr. 1057) According to Plaintiff's counsel's October 2015 correspondence with the ALJ, Dr. Reid referred to Plaintiff's medical record "as 'thousands' of pages and said that he could not do the work for $130." (Tr. 1551)

neuropsychological report completed on August 18, 2016.  (Tr. 1036-44, 1583-1586)  Plaintiff's counsel followed up with a letter, dated October 3, 2016, explaining:  "The claimant moved to Florida for a brief period of time and the neuropsychological report was prepared at the request of the Florida Division of Vocational rehabilitation."  (Tr. 1583)  Plaintiff's counsel stated that his office forwarded the report to the Appeals Council the same day they received it, and "[w]e were not aware until that day that this testing had been performed."  (Id.)  Plaintiff's counsel urged the Appeals Council to consider the neuropsychological report because it:  (1) "could not have been submitted sooner since it was administered only on August 18"; (2) was "material to the issue at hand" in that "psychological issues were raised at the hearing"; and (3) would change the outcome of the hearing decision.  (Id.)

In May 2017, the Appeals Council considered denied Plaintiff's request for review.  (Tr. 1029-31)  In regard to the newly submitted neuropsychological report, the Appeals Council stated:  "The Administrative Law Judge decided the claimant's case through January 20, 2016.  This new information is about a later time.  Therefore, it does not affect the decision about whether the claimant was disabled prior to January 20, 2016."  (Tr. 1029)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.    Factual Background

At the hearing January 2015 administrative hearing, Plaintiff testified as follows.  Plaintiff was born on October 19, 1976, she was 5' 5" tall, and weighed 272 pounds.  (Tr. 1165-66)  Plaintiff had a high school education and, although she completed vocational training in "dental assisting, therapeutic massage therapy, cosmetology," she was unable to pass the tests required for certification.  (tr. 1167)  Plaintiff lived alone and did not own a vehicle.  (Tr. 1166)

Plaintiff testified that she was first hospitalized for depression when she was fifteen years old. (Tr. 1171) As a child, Plaintiff also had hearing problems and would "just wake up and pus and blood…would be on my cheek, and it would be coming out of my ears." (Tr. 1171) Plaintiff stated that her mother physically and sexually abused her. (Tr. 1171-72)

When the ALJ asked Plaintiff to describe her panic attacks, she explained: "I sweat a lot, and everything in the room spins and I get real sick. And then, it's like you're in a tornado or something. You can't hardly breathe." (Tr. 1172) Plaintiff described an incident at her doctor's office that occurred the previous day:

> [L]ike the guy lost it at the medical place or my doctor's office yesterday, he just suddenly lost it because I got a co-pay of 50 cents and he's got to pay $80. And he couldn't figure out why. And then I just walked myself into a door trying to get in – I had a panic attack. I don't even remember getting up and walking to the door until I smacked my head into the door trying to get into the doctor's office…..

(Tr. 1172-73) Plaintiff "couldn't count" how frequently these episodes occurred because "[i]t's so much. It's all the time. Things trigger me." (Tr. 1173) When the ALJ asked "how long these feelings last," Plaintiff responded: "Sometimes it could be just an hour. Sometimes it could be weeks. Sometimes it could be days. Sometimes it's just whatever and I can stuff it back inside and go on about my business and act like a goof ball." (Tr. 1173)

Plaintiff testified that her doctor "needs me to see a psychiatrist," but "I can't get into a psychiatrist because they all take Medicare. And I can't get Medicare because nobody will give me disability or nothing to work with." (Tr. 1180) When the ALJ asked Plaintiff whether she experienced suicidal thoughts, she answered: "Well, yes I do. I got two bridges to pick from." (Tr. 1179) Plaintiff explained that she left Bibles open around her house "so I can read Scripture so that way I can try to keep my faith and not do it. You know, it's inhumane. They put dogs down when they're no longer good. I don't know why [sic] can't do a human being." (Tr. 1180)

Plaintiff testified that, when she went to the grocery store or Walmart, she would ride a cart because "I feel safer and plus my back don't hurt and I don't have to look people in their eye [sic]." (Tr. 1174) She explained that she did not like to look people in the eye because "they know my past, and they think of me as weak. And then they run over me, which they have." (Id.)

Plaintiff could not remember being fired from a job, but explained that she left her most recent employment as a telemarketer because "I just kept having anxiety where I would go to the bathroom and have to puke. . . . Then I broke out in a hive [sic], and I just broke out everywhere and I had to go to the hospital." (Id.) However, she later testified that the telemarketing company fired her but could not remember the reason why. (Tr. 1182)

According to Plaintiff, a "state lady" recently approved her for "home health," and a woman named Alicia helped Plaintiff wash her hair, cook, and "she'll visit with me because I'm alone. And healthy people don't like sick people." (Tr. 1177) Plaintiff also had an "advocate" from Pathways, who brought her to the hearing and acted as "my interpreter because…I'm having problems communicating with others and understanding period." (Tr. 1179)

At the hearing, Plaintiff was holding two pillows between the table and her torso because she underwent "bladder reconstruct" surgery the previous month. (Tr. 1175) Plaintiff explained: "It just hurts . . . . I got a mesh in there. And they're going to have to redo it. So I have to get this all reconstructed again because I'm incontinent right now." (Tr. 1175) Plaintiff stated she required the surgery because she was having frequent infections and "I was peeing blood, pooping blood and I'm still peeing blood, pooping blood." (Id.)

Plaintiff testified that stress aggravated her IBS. (Tr. 1176-77) Plaintiff stated that she had "the diarrhea problems" since she was eight years old, "but it's getting worse as I'm older."

(Tr. 1178)  When the ALJ inquired about the frequency of her diarrhea, Plaintiff did not answer the question, but stated:  "A lot of time I just…lay down in the bathroom and have a hot tub, you know, not a hot tub but a hot bathtub and then have my toilet there.  That way, I'm near both because sometimes it makes me puke it gets so bad."  (Tr.1176)  Plaintiff kept additional "potties" in her bedroom and kitchen because "Sometimes I wake up in the middle of the night, and it bears down so hard by the time I lift myself up because I am a big woman, I will poop my pants.  And if it's right there, I might have a chance to make it."  (Tr. 1177)

Plaintiff testified that, prior to her most recent surgery, she was able to walk about 200 feet.  (Tr. 1182)  Plaintiff was able to stand "about as long as it takes to make a steak" and could sit for no longer than thirty minutes.  (Tr. 1183-84)  When the ALJ asked Plaintiff how much weight she could lift, she answered:  "Well, not very much without incontinating [PHONETIC], you know.  I'd lift, and then I would be incontinent.  I'd say 20, 30 pounds."  (Tr. 1184)  Plaintiff added:  "As I sit here now, yeah, I'm getting soaked."  (Id.)  On a good night, Plaintiff would sleep from "7 o'clock at night to 5 o'clock in the morning," and "the worse would be that I'd be up for a couple days worrying and panicking or praying."  (Tr. 1186)  Plaintiff estimated that she dressed and put on clean clothes "about every three days."  (Tr. 1187)  Plaintiff stated: "I Febreze things all throughout the house, so they don't stink.  It's cheaper because I stink sometimes."  (Tr. 1188)

A vocational expert testified at the hearing.  [ECF No. 1189-94]  The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age and education and no past relevant work that was limited to light exertional work with the following limitations:

> This individual is unable to climb ladders, ropes, or scaffolds.  This individual is to avoid all operating and controlled moving machinery, working at unprotected heights and use of any hazardous machinery.  This individual is limited to occupations that involve only simple, routine repetitive tasks and a

> low stress job, defined as jobs that have only occasional decision making required and only occasional changes in the work setting occur, with no contact with the public and no interaction…coworkers, but contact with coworkers can still occur as long as that contact is casual and infrequent.

(Tr. 1189)  The ALJ responded that such an individual could work as a housekeeping cleaner, hand packager, or mailroom clerk.  (Tr. 1189-90)  However, a limitation to no contact with other people, including coworkers, would eliminate the hand packager and mail room clerk jobs and significantly reduce the number of housekeeping cleaner jobs.  (Tr. 1190-91)

In regard to unexcused and unscheduled absences, the vocational expert opined:  "Two would be the absolute limit in any one month and no unexcused absences are going to be tolerated for these jobs if they're happening with any regularity."  (Tr. 1191)  When asked about frequent bathroom breaks, the vocational expert testified that "it would become an issue if [the employer knew] about it."  (Tr. 1193)  When Plaintiff's attorney asked the vocational expert what would happen if the hypothetical individual "were to arrive at work late as much as an hour one day a week or…need to leave…an hour early, once a week," the vocational expert replied:  "They'd be fired after a short period of time."  (Tr. 1193-94)

With respect to Plaintiff's extensive medical treatment records, the Court accepts the facts set forth in Plaintiff's statement of uncontroverted facts and admitted by Defendant.  [ECF Nos. 23-1, 28-1]  The Court will discuss specific facts in the record as needed in the discussion below.

### III.     Standard for Determining Disability Under the Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. 42 U.S.C. § 423 (a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. §§ 404.1505(a), 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 20 C.F.R. § 404.1520, 416.92; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011).  Those steps require a claimant to show that he or she:  (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work.  Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC", which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. 404.1545(a)(1)); see also 20 C.F.R. §§ 416.920(e), 416.945(a)(1).  Through step four, the burden remains with the claimant to prove that he or she is disabled.  Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

IV.    **ALJ's Decision**

The ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since November 9, 2004, the alleged onset date of disability; (2) had the severe impairments of "disc bulges of the cervical and lumbar spine, irritable bowel syndrome (IBS), asthma, obesity; major depressive disorder, alternately diagnosed as bipolar disorder; generalized anxiety disorder, panic disorder, borderline personality disorder, and attention deficit disorder (ADD)"; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1060-66) Additionally, the ALJ determined that Plaintiff had the following non-severe impairments: bladder infections and bladder surgery; mild obstructive sleep apnea; hypertension and hyperlipidemia; endometriosis; "right knee strain"; gastroesophageal reflux disease and hiatal hernia; migraine headaches; and fatty liver disease and hepatic lobe lesion. (Tr. 1061-64)

The ALJ reviewed Plaintiff's testimony and the medical evidence and determined that, while her impairments "could reasonably be expected to cause some of the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 1080) More specifically, the ALJ discredited Plaintiff's subjective complaints because: they were not supported by the medical evidence; Plaintiff exhibited drug-seeking behavior; Plaintiff's treatment was "conservative and efficacious"; Plaintiff was non-compliant with some prescribed treatment; Plaintiff "made numerous unsubstantiated allegations" and "inconsistent statements"; Plaintiff enjoyed "robust activities of daily living"; and Plaintiff's "sporadic work history with low lifetime earnings" suggested lack of motivation to work. (Tr. 1080-85)

The ALJ determine that Plaintiff had the RFC to perform medium work with the following limitations:

she can sit for four hours at a time, for eight hours total in an eight-hour workday; can stand for two hours at a time, for six hours total in an eight-hour workday; can walk for two hours at a time, for six hours total in an eight-hour workday; can frequently stoop, kneel, crouch, crawl and climb stairs and ramps; can occasionally climb ladders or scaffolds; can tolerate frequent exposure to extreme cold, humidity, wetness, dust, odors, fumes, and pulmonary irritants; can frequently operate a motor vehicle; can tolerate occasional exposure to unprotected heights and moving mechanical parts; is limited to occupations that involve only simple, routine and repetitive tasks in a low-stress job, defined as one requiring only occasional decision-making and occasional changes in the work setting; and can tolerate occasional interaction with supervisors, coworkers, and the public.

(Tr. 1070)  At step four of the sequential evaluation, the ALJ determined that Plaintiff had no past relevant work.  (Tr. 1085)  Finally, based on the vocational expert's testimony, the ALJ found that there existed a significant number of jobs in the national economy that Plaintiff could perform, including dishwasher, stores laborer, and housekeeping cleaner.  (Tr. 1085-86)  The ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 9, 2004, through the date of this decision[.]"  (Tr. 1087)

**V.    Discussion**

Plaintiff claims that the ALJ erred in determining her RFC because the ALJ failed to:  (1) properly evaluate the medical opinion evidence;  (2) find that Plaintiff's "bladder infections and surgery" constituted a severe impairment;  and (3) consider "the combination of Plaintiff's impairments."  [ECF No. 28]  Plaintiff also argues that the ALJ's decision was not supported by substantial evidence because it did not include the August 2016 neuropsychological report that Plaintiff submitted to the Appeals Council.  [Id.]  In response, the Commissioner asserts that:  (1) the ALJ properly assessed Plaintiff's RFC; and (2) the new evidence submitted to the Appeals Council was not a basis for reversing the ALJ's decision.  [ECF No. 28]

A.  Standard for Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence supporting a contrary outcome." Id. (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

The Court does not "reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a Court must affirm the ALJ's decision "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings." Cruze v. Charter, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)); Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. RFC

Plaintiff claims the ALJ erred in determining her RFC because substantial evidence did not support the finding that she was capable of performing a range of "medium work" as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c).[3] In particular, Plaintiff challenges the ALJ's reliance

---

[3] The regulations provide that "medium work" involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§

on the medical opinions of two non-examining consulting physicians. The Commissioner counters that the ALJ, in accordance with the court's remand order, "obtain[ed] medical evidence addressing [Plaintiff's] ability to function in the workplace and perform work-related activities, and reassess[ed] her residual functional capacity." [ECF No. 28 at 4-5 (quoting Dace, 2014 WL 1228894, at *23)] The Commissioner further asserts that the ALJ properly evaluated the credibility of Plaintiff's subjective reports, which was critical to the RFC determination. [Id.]

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."[4] Dace, 2014 WL 1228894, at * 20 (emphasis in original) (quoting SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). Thus, although the ALJ is not limited to considering medical evidence, "some medical

---

404.1567(c), 416.967(c). A job is classified as "light work" when "it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[4] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Dace, 2014 WL 1228894, at *20 (quoting SSR 96-8p).

evidence 'must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer, 245 F.3d at 704).

1.  Physical RFC

Plaintiff asserts that no evidence in the record, including Dr. Winkler's medical opinion, to which the ALJ assigned great weight, demonstrated that Plaintiff had the physical RFC to perform medium work. The Commissioner counters that the RFC was not based solely on Dr. Winkler's opinion, but also on the objective medical evidence and the record as a whole.

In reviewing this case, the Court is mindful that Judge Adelman remanded the 2010 ALJ decision because the RFC was not supported by substantial evidence in that the record lacked medical evidence addressing Plaintiff's ability to function in the workplace. Dace, 2014 WL 1228894, at *20, 22. Accordingly, Judge Adelman remanded the case to the Commissioner with directions to obtain opinion evidence relating to how Plaintiff's impairments – namely, obesity, panic disorder with anxiety, and IBS – affected her ability to work. Id. at *22.

"Where a court finds that the [Commissioner] has committed a legal or factual error in evaluating a particular claim, the district court's remand order will often include detailed instructions concerning the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed." Sullivan v. Hudson, 490 U.S. 877, 885 (1989). "Deviation from the court's remand order in the subsequent administrative proceedings itself is itself legal error, subject to reversal on further judicial review." Id. at 886. See also Carter v. Colvin, No. 4:14-CV-1006 NAB, 2015 WL 4478292, at *3 (E.D. Mo. July 22, 2015).

Here, the ALJ declined, on remand, to order consultative examinations and, instead, considered Plaintiff's "ample treatment notes," as well as answers to interrogatories and a physical MSS in checklist form completed by Dr. Winkler. (Tr. 2106-15) Dr. Winkler did not examine Plaintiff but based her assessment on Plaintiff's medical records. (Tr. 2113) According to Dr. Winkler, Plaintiff could lift/carry: continuously up to ten pounds; frequently eleven to twenty pounds; and occasionally twenty-one to fifty pounds. (Tr. 2106) Dr. Winkler opined that Plaintiff could: sit for four hours at time, for eight hours total in an eight-hour workday; stand for two hours at a time, for six hours total in an eight-hour workday; and walk two hours at a time, for six hours total in an eight-hour workday. (Tr. 2107) Dr. Winkler also stated that Plaintiff could continuously use her upper extremities for all manipulative activities and her lower extremities for operation of foot controls. (Tr. 2108) In regard to postural activities, Dr. Winkler found that Plaintiff could: continuously balance; frequently climb stairs and ramps, stoop, kneel, crouch, and crawl; and occasionally climb ladders or scaffolds. (Tr. 2109)

In his decision, the ALJ explained that he assigned Dr. Winkler's opinion "great weight" because it was consistent with the objective medical evidence, including the diagnostic imaging of Plaintiff's spine and the pulmonary function test result. (Tr. 1076) The ALJ also found that Dr. Winkler's opinion was consistent with Plaintiff's treatment history, which "consisted of prescription medications and some emergency room visits,[5] but few hospitalizations, little treatment with specialists, and no recommendations to abstain from any exertional or other activities." (Id.) The ALJ acknowledged that Dr. Winkler did not examine Plaintiff, but he found that her opinion nonetheless provided "a complete and longitudinal perspective of the

---

[5] To the extent the ALJ credited Dr. Winkler's opinion because it was consistent with Plaintiff's treatment history of prescription medications and "some hospitalizations," the ALJ appeared to minimize Plaintiff's emergency room visits. According to the Court's count, Plaintiff presented to emergency rooms over sixty times between July 2003 and May 2014.

claimant's physical impairments and resultant limitations" because it was "informed by thorough review of all the medical evidence of record…." (Id.)  The ALJ reasoned that because "no treating or examining physician has provided opinion evidence regarding the claimant's physical impairments and resultant limitations,…Dr. Winkler's opinion is particularly probative." (Id.)

Here, the only medical opinion evidence in the record relating to the effects of Plaintiff's physical impairments was Dr. Winkler's assessment.  Dr. Winkler never examined Plaintiff and based her RFC assessment entirely on Plaintiff's medical records.  Contrary to the ALJ's statement, the absence of other opinion evidence does not render Dr. Winkler's opinion "particularly probative."  Furthermore, Dr. Winkler provided little analysis in the MSS.  The Eighth Circuit has held that "a conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little to no elaboration."  Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010)).

Even if the Court were to accept Dr. Winkler's opinion as substantial evidence of Plaintiff's physical RFC, it would not support the ALJ's determination that Plaintiff could perform medium work.  The SSA regulations provide that "medium work" involves "lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds."  20 C.F.R. §§ 404.1567(c), 416.967(c).  However, Dr. Winkler's opinion endorsed an ability to frequently lift up to only twenty pounds.  (Tr. 2106)  Indeed, the record contains no medical evidence demonstrating that Plaintiff was able to perform medium work.

The Commissioner maintains that substantial evidence supported the RFC determination because the ALJ satisfied Judge Adelman's remand order directing him to "obtain[] medical evidence addressing claimant's ability to function in the workplace and perform work-related activities" and "reassess her residual function capacity."  [ECF No. 28 at 4-5 (quoting Dace,

2014 WL 1228894, at *23)]  While the Commissioner is correct in that the court's remand order did not specifically require medical opinion evidence from an *examining* physician, the court's memorandum clearly contemplated such evidence.[6]  See Id. at *22-23.

Despite the court's order urging the ALJ, on remand, to obtain a consultative physical examination, Dr. Winkler never examined Plaintiff and based her RFC assessment solely upon Plaintiff's medical records.  Given Plaintiff's voluminous medical records and complicated medical history, the checklist-form assessment by a non-examining physician does not constitute substantial evidence supporting the ALJ's finding that Plaintiff had the RFC to perform medium work.  As a result of the ALJ's decision not to order a consultative examination, the record remained "devoid of any other physician expressing an opinion regarding claimant's physical…ability to function in the workplace."  Dace, 2014 WL 1228894, at *23.  "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole."  Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003).  See also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (relying upon non-examining, non-treating physicians to form an opinion on a

---

[6] The following statements evidenced the need for opinions by examining or treating physicians:

- "There is no opinion in the record from any physician regarding Claimant's work-related limitations.  The record shows that Claimant did not undergo a consultative physical examination."

- "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision."  Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (alteration in original).

- "Claimant did not undergo a consultative physical examination.  Thus, the record is devoid of any other physician expressing an opinion regarding claimant's physical or mental ability to function in the workplace."

Dace, 2014 WL 1228894, at *22-23.

claimant's RFC does not satisfy the ALJ's duty to fully and fairly develop the record). As a result, substantial evidence did not support the ALJ's physical RFC determination.

2. Mental RFC

Plaintiff also challenges the ALJ's reliance on the opinion of non-examining, consulting psychologist Dr. Perry in determining her mental RFC. [ECF N. 23 at 43-44] Dr. Perry answered interrogatories and completed a mental MSS in checklist form in September 2015. (Tr. 2132-41) Dr. Perry stated that Plaintiff had the following mental impairments: depression, bipolar disorder, major depressive disorder, anxiety, generalized anxiety disorder, panic disorder, PTSD, and borderline personality disorder. (Tr. 2137) Dr. Perry opined that, as a result of these impairments, Plaintiff had no limitations on understanding, remembering, or carrying out simple instructions or making simple work-related decisions, but she had moderate difficulties understanding remembering, and carrying out complex instructions and making complex work-related decisions. (Tr. 2139) Additionally, Dr. Perry found that Plaintiff's ability to interact appropriately with the public, supervisors, and coworkers, and respond appropriately to usual work situations and changes were moderately restricted. (Tr. 2140)

Dr. Perry summarized over 2000 pages of medical records in a single paragraph as follows:

> Claimant's record notes that she returned to work full time in 2008. At a 6/27/12 appointment, claimant noted problems with expressions of anger and sleeping but otherwise she was enjoying spending time with her boyfriend, going out to parties regularly and she had not been motivated to attend her job. A Medical Source Statement in August 2009 completed by treating psychologist indicates functioning that ranges from no limitations to extreme limitation (e.g. extreme limitation in ability to handle stress, maintain attention and concentration, and understand, remember and carry out detailed instructions). A Mental Residual Functional Capacity Assessment completed by non-treating psychologist in February 2012 indicates that claimant can understand, remember and carry out simple work tasks, withstand the pressure of work and interact adequately with co-workers and supervisors. There is

18

evidence in the medical record that claimant has been non-complaint with treatment recommendations.

(Tr. 2137) (citations to record omitted).  Dr. Perry concluded that Plaintiff was able to:  complete simple, repetitive, and routine tasks; work in situations that required only occasional interaction with co-workers, supervisors, and the general public; and work in a low-stress work environment, such as one without strict productivity standards.  (Tr. 2138)

The ALJ assigned "great weight" to Dr. Perry's opinion, finding that it was "consistent with and supported by the objective medical evidence of record[.]"  (Tr. 1076)  More specifically, the ALJ determined that Dr. Perry's evaluation was consistent with "the intermittent findings of anxious or euthymic mood and affect and poor or good insight and judgment, and the consistent findings of normal thought processes, thought content, good attention and concentration, good immediate recall, and intact recent and remote memory."  (Tr. 1076-77) Additionally, the ALJ found that Dr. Perry's opinion was consistent with Plaintiff's psychiatric treatment history, "namely the medications and counseling that she has reported have been helpful in mitigating her symptoms." (Tr. 1077)  Based on Dr. Perry's evaluation, the ALJ found that Plaintiff could maintain full-time employment limited to occupations that involved "only simple, routine and repetitive tasks in a low-stress job" and "occasional interaction with supervisors, coworkers, and the public."[7]  (Tr. 1070)

When evaluating the non-examining source's opinion, the ALJ should consider the degree to which the opinion considers all of the pertinent evidence in the claim, including the opinions of treating and other examining sources.  Wildman, 596 F.3d at 967.  Here, it is not

[7] The ALJ also reviewed the mental RFC assessment and psychiatric review technique completed by non-examining state agency consultant Dr. Altomari in February 2012 and the mental MSS completed by Plaintiff's treating primary care physician, Dr. Barbin, in 2009.  The ALJ assigned Dr. Altomari's opinion "less weight" than Dr. Perry's, and he assigned Dr. Barbin's opinion "little weight."  (Tr. 1077)

clear that Dr. Perry evaluated all of Plaintiff's medical records.[8]   Indeed, Dr. Perry summarized over 2,000 pages of records in a five-sentence "Abbreviated Record Review" and two of those sentences contained inaccuracies. (Tr. 2137)   For example, Dr. Perry began her record review with the statement that Plaintiff "returned to work full time in 2008."   (Tr. 2137)   However, Plaintiff's records reveal that she attempted to return to work in 2008, but those efforts were unsuccessful.[9]   To the extent Dr. Perry's mistaken belief that Plaintiff worked full-time in 2008 informed her opinion that Plaintiff was not disabled, Dr. Perry's opinion deserves less weight.

Additionally, in support of her opinion that Plaintiff's mental impairments were not debilitating, Dr. Perry discussed a single treatment note that was more than three years old.   Dr. Perry noted that, in June 2012, Plaintiff informed her psychiatrist Dr. Gowda that she was experiencing "problems with expression of anger and sleeping but otherwise she was enjoying spending time with her boyfriend, going out to parties regularly and she had not been motivated to attend her job."   (Tr. 2137)   This treatment note provides a snapshot of Plaintiff's mental status in June 2012, but is not a proper basis to determine Plaintiff's functional limitations.[10]

"[R]ecognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation."   Lillard v. Berryhill, 376 F.Supp.3d 963, 984 (E.D. Mo. 2019).   See also Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996).   "Given that a claimant's level of mental functioning may seem relatively adequate at a specific time, proper evaluation of the impairment must take into account a claimant's level of functioning 'over time.'"   Frederick v. Berryhill, 247 F.Supp.3d 1014, 1022 (E.D. Mo. 2017) (quoting 20 C.F.R., Pt. 404, Subpt. P,

---

[8] As previously noted, another consulting psychologist declined to render an opinion because he could not review "thousands" of pages of medical records for $130.  (Tr. 1551)

[9] In 2008, Plaintiff briefly worked three different jobs, earning a total of $1,126.18.  (Tr. 163)

[10] Dr. Perry also addressed the two medical opinions that the ALJ discussed in his opinion – Dr. Barbin's 2009 mental MSS and Dr. Altomari's February 2012 evaluation.  (Tr. 2137)

App. 1, § 12.00 (D)(2)).  Indeed, a review of Plaintiff's medical records as a whole reveal that, while her symptoms waxed and waned, her reports of anxiety, depression, poor mood, tearfulness, low self-esteem, difficulty sleeping, and self-isolation were consistent and, in fact, intensified, in 2013 and 2014.

Judge Adelman remanded the 2010 ALJ decision because the RFC was not supported by substantial evidence in that the record lacked medical evidence of Plaintiff's mental ability to function in the workplace.  Dace, 2014 WL 1228894, at *20, 22.  In particular, Judge Adelman emphasized the absence of any consultative examinations relating to Plaintiff's mental limitations.  The opinion the ALJ obtained from Dr. Perry, a non-examining psychologist, did not remedy the problem identified by Judge Adelman when he remanded Plaintiff's case for medical evidence.  As a result, substantial evidence did not support the ALJ's mental RFC determination.

3.  New Evidence

Plaintiff further claims that substantial evidence did not support the ALJ's decision because the ALJ did not have the benefit of the August 2016 neuropsychological report submitted to the Appeals Council.  [ECF No. 23 at 48]  The Commissioner counters the report is not a basis to reverse the ALJ's decision because:  (1) the report did not constitute new, material evidence relating to a time period before the ALJ's decision; and (2) had it been considered by the ALJ, it would have been entitled "to very little weight and would not have changed the ALJ's decision."  [ECF No. 28 at 13-15]

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision.  Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000) (citing 20 C.F.R. §

404.970(b)).  The newly submitted evidence thus becomes part of the "administrative record," even though the evidence was not originally included in the ALJ's record. Id. (citing Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir.1992)).  "If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case." Id. (citing 20 C.F.R. § 404.970(b)).  "Where…the Appeals Council considers new evidence but denies review, [the Court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citations omitted).

In August 2016, Dr. Merin performed a neuropsychological evaluation and general personality assessment of Plaintiff for the purpose of determining "the absence or presence of neurocognitive impairments and degree to which psychological factors are relevant to Vocational Rehabilitation."  (Tr. 1036-1044)  Dr. Merin administered the Wechsler Memory Scale – Third Edition, the results of which placed Plaintiff within the mildly impaired range for verbal memory and low average range for visual/spatial recall.  (Tr. 1039)  The Rey Complex Figure Drawing, a test of visual memory, revealed that Plaintiff had "global deficiencies with regard to visual attention and new learning" and an inability "to integrate relevant information and retain it over time."  (Tr. 1039-40)  The reading recognition portion of the Wide Range Achievement Test – 4th Edition placed Plaintiff "at the 16th percentile and 8.9 Grade Equivalent."  (Tr. 1040)  Plaintiff also performed "quite poorly on all measures associated with visual and auditory attention/concentration," and Dr. Merin opined that there was "a high degree of probability [that Plaintiff's] psychology significantly disrupts her capacity to attend to and retain relevant information."  (Id.)

In regard to Plaintiff's speech and language, Dr. Merin's behavioral observations revealed "poor articulation, confusion, tangential thinking, and circumstantial information. She was quickly confused and perplexed." Id. Dr. Merin noted that formal exams showed "a lack of verbal development with regard to new learning and extrapolation. Verbal fluency is equally impaired." (Id.) When measuring Plaintiff's "executive factors," he had to discontinue the Booklet Category Test after Plaintiff "became markedly confused and frustrated. She was unable to understand task demand, much less solve novel problems." (Tr. 1041) Plaintiff's score on the Stroop Interference Procedure showed that her "brain-related functions are significantly and globally impaired" as she was "unable to attend to, inhibit, and respond appropriately to changing information." (Id.)

Dr. Merin administered personality examinations, which evidenced "acute emotional distress within the context of long-term psychological infirmities and personality characteristics that leave [Plaintiff] vulnerable to minor stressors." (Tr. 1041) Dr. Merin noted: "Behavioral observations revealed the quickness to which she deteriorated and fragmented in response to difficult items." (Id.) Dr. Merin also observed that Plaintiff "failed to respond to specific test instructions to answer/endorse one of each item" because "her obsessive/compulsive tendencies and fears of responding inappropriately resulted in multiple endorsements per item." (Tr. 1041-42) Plaintiff was unable to complete the MMPI-2, and her score on the Beck Depression Inventory-II placed her in the "severe range." (Id.) Dr. Merin opined: "There is a high degree of probability [Plaintiff's] early development as well as neurocognitive deficiencies have contributed to her inability to resolve minor problems and remain emotionally stable. This appears to be a long-term/chronic condition resistant to effective change." (Tr. 1042)

In concluding his report, Dr. Merin stated:

> The above findings revealed a complex of factors including the presence of acute anxieties and depression within the context of long-term/chronic psychological and medical infirmities that precipitate and perpetuate her impairments….[T]here appears to be a close and integral relationship among and between psychological factors, neurocognitive capacities, and medical infirmities.

(Tr. 1043) As to Plaintiff's ability to maintain employment, Dr. Merin concluded: "[P]rognosis for full-time gainful employment at this time appears poor. Instead, part-time placement will be recommended….A job coach will be necessary during the initial phases of employment." (Tr. 1044)

Here, the Appeals Council considered the neuropsychological report and determined that the "new information is about a later time" and, therefore, did "not affect the decision about whether the claimant was disabled prior to January 20, 2016." (Tr. 1029) In such circumstances, a court does "not evaluate the Appeals Council's decision to deny review, but rather [it] determine[s] whether the record as a whole, including the new evidence, supports the ALJ's determination." Cunningham, 222 F.3d at 500.

Plaintiff acknowledges that the report was completed six months after the ALJ's decision but maintains that it "relates to cognitive problems that are long standing." [ECF No. 23 at 48] "The timing of an examination is not dispositive of whether evidence is material; medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision." Cunningham, 222 F.3d at 502 (citing Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)). The Court agrees that, even though Dr. Merin's report post-dated the relevant time period, it related to impairments that existed during that period. In fact, the report references neurocognitive impairments that appeared in Plaintiff's medical records as early as October 1990, when she underwent a psychological assessment at Washington University School of Medicine's Department of Psychiatry. (see Tr. 2278-92) The

Court finds that the neuropsychological report was material and the record as a whole, including the neuropsychological report, does not support the ALJ's finding that Plaintiff was able to maintain full-time employment.

Because the Court is remanding this case for further consideration, the Court will not "speculate…on how the administrative law judge would have weighed the newly submitted report[] if [it] had been available or the original hearing." Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994). Instead, the Court directs the ALJ, on remand, to consider and weigh Dr. Merin's findings. See, e.g., Kratz v. Colvin, No. 12-CV-89 LRR, 2013 WL 4505593, at *14 (N.D. Iowa Aug. 22, 2013). Likewise, because the Court reverses and remands on the grounds that that substantial evidence did not support the ALJ's RFC determination, the Court will not address Plaintiff's claims that the ALJ erred in failing to: (1) find her "bladder infections and surgery" constituted a severe impairment; and (2) consider her severe impairments in combination.

## VI.    Conclusion

Based on the foregoing, the Court finds that the Commissioner's decision is not supported by substantial evidence on the record as a whole. Because Plaintiff first applied for benefits in 2007 and it is now 2019, the Commissioner is urged to begin proceedings without delay and resolve this case as soon as possible.

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and remanded for the awarding of benefits.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of September, 2019